**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-2177**

---

THE IMAGING CENTER, INCORPORATED; F. DANIEL
JACKSON, M.D.; IMAGING ASSOCIATES OF
CUMBERLAND, INCORPORATED,

                                    Plaintiffs - Appellants,

          versus

WESTERN MARYLAND HEALTH SYSTEMS, INCORPORATED;
TRI-STATE RADIOLOGY, P.C.,

                                    Defendants - Appellees,

          and

MYUNG-SUP KIM, M.D.,

                                    Defendant.

---

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  William M. Nickerson, Senior District
Judge. (CA-02-2902-WMN)

---

Argued:  September 21, 2005          Decided:  December 13, 2005

---

Before KING and GREGORY, Circuit Judges, and R. Bryan HARWELL,
United States District Judge for the District of South Carolina,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Thomas Erik Gilbertsen, COLLIER, SHANNON & SCOTT, P.L.L.C., Washington, D.C., for Appellants. Lewis A. Noonberg, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Washington, D.C.; Edward John Steren, OBER, KALER, GRIMES & SHRIVER, Washington, D.C., for Appellees. **ON BRIEF:** Theresa A. Coetzee, COLLIER, SHANNON & SCOTT, P.L.L.C., Washington, D.C., for Appellants. Kathleen A. Ellis, Susan H. Pope, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Baltimore, Maryland, for Appellee Western Maryland Health Systems, Incorporated; David B. Hamilton, Sarah N. Otwell, OBER, KALER, GRIMES & SHRIVER, Washington, D.C., for Appellee Tri-State Radiology, P.C.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

In this antitrust case, F. Daniel Jackson, M.D. and the companies he controls, The Imaging Center, Inc. and Imaging Associates of Cumberland, Inc. (collectively "The Imaging Center"), appeal from the district court's grant of summary judgment to Defendants Western Maryland Health System, Inc. ("WMHS") and Tri-State Radiology, P.C. ("Tri-State") on The Imaging Center's Sherman Act and Maryland state law claims. The Imaging Center alleges that WMHS and Tri-State engaged in a group boycott and exclusive dealing in violation of § 1 of the Sherman Act, thereby limiting competition for radiology services. The Imaging Center also maintains that Defendants engaged in monopolization and attempted monopolization in the relevant market in violation of § 2 of the Sherman Act. Finally, The Imaging Center alleges that Defendants committed antitrust violations, misappropriated trade secrets, maliciously interfered with The Imaging Center's business operations, and engaged in unfair competition in violation of Maryland law. Because the district court correctly concluded that The Imaging Center failed to raise a genuine issue as to any material fact, and because Defendants are entitled to judgment as a matter of law, we affirm its grant of summary judgment to Defendants on all claims.

Through the mid-1990s, two competing primary care hospitals, The Memorial Hospital and Medical Center of Cumberland, Inc. ("Memorial") and Sacred Heart Hospital of the Sisters of Charity, Inc. ("Sacred Heart"), serviced the Cumberland area. At that time, Centre Radiology, P.A. had an exclusive contract to provide radiology services at Memorial, and Summit Radiology had an exclusive contract to provide radiology services at Sacred Heart. Dr. Jackson practiced at Memorial as a member radiologist of Centre Radiology from 1977 to 1990. In 1990, Dr. Jackson left Centre Radiology to establish The Imaging Center, through which he conducts his own radiology practice.

In 1996, consolidation changed the Cumberland-area health services market. That year, Memorial and Sacred Heart affiliated to form WMHS. WMHS also purchased a number of health care clinics and physician practices in Western Maryland, such that in 2000, WMHS accounted for 73.7% of all discharges in its primary market. J.A. 1755. Also in 1996, Centre Radiology and Summit Radiology affiliated to form Tri-State. Tri-State has had exclusive contracts to provide radiology services to inpatients at WMHS facilities since February 1998.

At present, there are three main facilities that provide outpatient radiology services in the Cumberland area. In addition to The Imaging Center, WMHS has a comprehensive outpatient

radiology center that it opened in the spring of 2003, and a radiologist formerly affiliated with Tri-State opened Advanced Diagnostic Radiology, LLC in the fall of 2003.

In the early 1990s, The Imaging Center received most of its business from physician referrals. From 1990 through 1998, the number of procedures performed at The Imaging Center rose steadily. In 1999 and 2000, however, the number of procedures performed dropped and has since failed to return to 1998 levels. A survey conducted shortly thereafter revealed that most patients of The Imaging Center were self-referred and that The Imaging Center had "limited support from physicians." J.A. 1461. The Imaging Center contends that its radiology service was superior to Defendants', pointing to a 2001 WMHS survey of Cumberland physicians indicating that WMHS's "[k]ey competitor is Dr.Jackson [sic] focusing on superior patient satisfaction." Id. In addition, The Imaging Center notes that WMHS documented complaints about its own radiology service and equipment.

The Imaging Center therefore attributes the decline in procedures it performed to an alleged group boycott, through which Defendants coerced doctors to reduce their referrals to The Imaging Center. The Imaging Center argues that the challenged activities began years before WMHS had the market power to effect the alleged anticompetitive harms in the late 1990s. Specifically, it points to one doctor's testimony that in the 1970s, there was an "unspoken

5

rule" that doctors would use the hospital's facilities. J.A. 1099, 1104. Moreover, shortly after The Imaging Center opened in 1990, Memorial adopted an "Action Plan" to improve its own radiology services and began monitoring physician radiology referrals and meeting with physicians about those referrals. Id. at 1167-68, 1170, 1180.

Meanwhile at Sacred Heart, Dr. George M. Pellegrino testified that up until he left in 1996, hospital officials monitored his referrals and pressured him to reduce referrals to The Imaging Center. J.A. 945-46. Significantly, however, these discussions did not cause Dr. Pellegrino to change his referral patterns, and Sacred Heart took no action against him. Id. at 947.

As to more recent conditions, The Imaging Center points to the testimony of Dr. Robustiano J. Barrera that "almost all physicians" in the Cumberland area believed that "if you are associated with Dr. Jackson you are against Memorial system [sic], which I did not believe until I started experiencing it myself." J.A. 461-63. However, Dr. Barrera did not believe that WMHS punished him in any way for sending referrals to The Imaging Center. Id. at 461.

In addition to the referral monitoring, The Imaging Center argues that WMHS illegally interfered with a proposed sale of land from Allegany College of Maryland to The Imaging Center. In 1999, Dr. Jackson offered to purchase a 20-acre tract of land from Allegany College, which he planned to use for an expanded radiology

6

facility and medical office complex.  However, prior to a meeting of the Allegany College trustees to vote on the sale, Allegany College Trustee and WMHS Director Kim Leonard discovered that four of the trustees had a conflict of interest.  Leonard wrote to the Board,

> I was recently informed by the Western Maryland Health System that it might not be in the best interests of the System to have Dr. Jackson purchase the land and then to build a health clinic that would compete against the System.  This information would ordinarily not be a significant event in the sale of land; however, four of us are members of the boards of the WMHS.

J.A. 1428.  Leonard contacted the Maryland Ethics Commission and confirmed that the four trustees had a definite conflict of interest.

When the Allegany College trustees next met, the three trustees without a conflict voted 2-1 to approve the sale. However, due to concerns about the ability of a minority of trustees to take a business action, they sought legal advice. Counsel for the Maryland State Ethics Commission advised that a quorum should have voted.  The attorney counseled that after declaring the conflict, the least conflicted trustee could vote to achieve a quorum, and in the event of a tie, the next least conflicted trustee should vote.[1]  The trustees followed the

---

[1]The trustees memorialized their actions and sent them to the Ethics Counsel for confirmation.  The counsel's response differed slightly from what was indicated by the minutes, stating that he could not define "quorum" without looking at their bylaws, but acknowledging that he suggested the procedure of having the least-

7

suggested procedure, which initially resulted in a 2-2 tie, and ultimately a 3-2 vote against the sale. The trustees voting against the sale expressed a reluctance to sell unless the college could purchase replacement property and indicated their concern that Dr. Jackson had not stated definitively how the land would be used and how that use would benefit the educational mission of the college.

The Imaging Center filed suit against WMHS and Tri-State on September 3, 2002 in the District of Maryland. It alleged a group boycott and exclusive dealing in violation of § 1 of the Sherman Act; monopolization and attempted monopolization in violation of § 2 of the Sherman Act; violations of the Maryland Antitrust Act; and misappropriation of trade secrets, malicious interference with business, and unfair competition under Maryland tort law. The district court granted summary judgment for the defendants on all claims on August 10, 2004. This appeal followed.

## II.

This Court reviews a district court's award of summary judgment de novo, taking all the nonmovant's evidence as true and drawing all justifiable inferences in its favor. Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002). Summary judgment is appropriate "if the pleadings, depositions,

_____

conflicted trustee vote. J.A. 1438.

8

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### III.

The Imaging Center alleges that WMHS engaged in both a group boycott and exclusive dealing in violation of § 1 of the Sherman Act.[2] Section 1 prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . ." 15 U.S.C. § 1. This provision has been interpreted to preclude only restraints that are "unreasonably restrictive of competitive conditions." Cont'l Airlines, 277 F.3d at 508 (quoting Standard Oil Co. v. United States, 221 U.S. 1, 58 (1911)). Thus, to establish a violation of § 1 of the Sherman Act, a plaintiff must prove two elements: (1) a contract, combination, or conspiracy, (2) that imposed an unreasonable restraint of trade. Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002).

The first element requires a concerted action by two or more persons. Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d

---

[2]Defendants argue that The Imaging Center's claims are barred by the Sherman Act's four-year statute of limitations. Because we find that summary judgment was appropriate on the merits of The Imaging Center's claims, we will assume, arguendo, as the district court did, that The Imaging Center's claims are not time-barred, given the alleged recent accrual of damages and the allegations of a continuing violation.

9

539, 542 (4th Cir. 1991). This element is satisfied even where "one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." Dickson, 309 F.3d at 205 (quoting MCM Partners, Inc. v. Andrews-Bartlett & Assocs., 62 F.3d 967, 973 (7th Cir. 1995)). Trade-restraining concerted action may be inferred from conduct. Laurel Sand & Gravel, 924 F.2d at 542. However, when these actions could be consistent with either (1) independent conduct or a legitimate business purpose or (2) an illegal agreement, "proof must be offered that tends to exclude the first interpretation" in order to avoid summary judgment. Id. This is because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

The second element of any § 1 claim requires a showing that the restraint on competition is unreasonable. Cont'l Airlines, 277 F.3d at 508. In order to evaluate this second element, courts use one of three methods, depending on the restraint alleged: "(1) per se analysis for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." Id. at 508-09.

10

A.

The Imaging Center first alleges that Defendants engaged in a group boycott in which WMHS and Tri-State coerced doctors to stop referring radiology patients to The Imaging Center. As the district court determined, however, the evidence obtained through discovery did not support The Imaging Center's claim. Although WMHS monitored the doctors' radiology referrals and one doctor stated that he felt pressure from WMHS predecessor Sacred Heart to cease referrals to The Imaging Center, Plaintiffs failed to present evidence of any doctor who changed his or her referral patterns or suffered consequences for refusing to do so. The Imaging Center has thus failed to show that the referral monitoring or the "unspoken rule" they alleged to be illegal actually manifested into a group boycott by the doctors.

Indeed, as the district court noted, the practice of referral monitoring is fully consistent with a procompetitive effort to improve WMHS radiology facilities and services. In addition, Dr. Jackson and others testified that some doctors had expressed disapproval of the way Dr. Jackson practiced, indicating that any decline in referrals could be attributed to the doctors' independent decisions. See J.A. 541-45, 618-19, 530-31, 919, 990, 1049. The conduct The Imaging Center suggests is illegal is thus also consistent with both a legitimate purpose and independent action by the alleged co-conspirators. It was therefore incumbent

11

on The Imaging Center to offer evidence excluding these interpretations to support its allegations of an illegal agreement. See Laurel Sand & Gravel, 924 F.2d at 542. The Imaging Center has failed to do so.[3] Accordingly, it has failed to support its allegation of a group boycott.

Turning to the second prong of the § 1 analysis, The Imaging Center argues that Defendants' actions should be held to be a per se unreasonable restraint of trade because group boycotts have been classed as such by the courts. However, having failed to show a group boycott, the district court correctly found that per se analysis did not apply to Defendants' referral monitoring activities and used the rule of reason to evaluate them. See Dickson, 309 F.3d at 205 (where anticompetitive effects are not obvious, a full rule of reason analysis is appropriate). Under the rule of reason, The Imaging Center was required to show harm to

---

[3]Citing In re Flat Glass Antitrust Litg., 385 F.3d 350, 360 (3d Cir. 2004), The Imaging Center also argues that in absence of evidence of collusion, it may prove concerted action and negate inferences of independent conduct through certain "plus factors." However, the Flat Glass plus factors apply where "conscious parallelism" is alleged. Conscious parallelism refers to the situation of an oligopoly or concentrated market where firms maintain supracompetitive price levels while aware of and because of the similar action of the few other firms in their sector. Id. at 359. Such is not the situation here.

We also decline to attach the significance The Imaging Center does to Key Enters. of Delaware, Inc. v. Venice Hosp., 919 F.2d 1550 (11th Cir. 1990), vacated for reh'g en banc, 979 F.2d 806 (11th Cir. 1992), dismissed as moot, 9 F.3d 893 (11th Cir. 1993), where the Eleventh Circuit upheld a jury finding of group boycott. That case is of no precedential authority even in its own circuit.

competition: "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." Oksanen v. Page Memorial Hosp., 945 F.2d 696, 708 (4th Cir. 1991) (en banc). This is because "[t]he antitrust laws were enacted for the protection of competition, not competitors." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338 (1990) (internal quotation omitted) (emphasis in original).

The district court determined that The Imaging Center had failed to demonstrate adverse effects on the Cumberland-area market that would constitute an unreasonable restraint on trade. It appropriately dismissed The Imaging Center's claims that Defendants' actions reduced the output and quality of radiology services as unsupported. Indeed, since the creation of WMHS and Tri-State, the availability of radiology services has increased. The Imaging Center remains as a provider, WMHS introduced a new outpatient radiology clinic, and the Advanced Diagnostic Radiology facility recently opened.[4]

Furthermore, there is no evidence that quality of services has declined. Although the record contains some evidence of complaints with Defendants' radiology services, there is nothing to suggest

---

[4]The Imaging Center points to a 1999 WMHS reference to "pent up demand[ ]" for radiology services. J.A. 1347. Notwithstanding the fact that this statement was merely an assumption of a WMHS consultant evaluating the feasibility of a new imaging center, the statement does not speak to a decline in the available quantity of radiology services.

13

that this is attributable to Defendants' actions or that complaints have become more prevalent. For these reasons, The Imaging Center has failed to provide evidence that an antitrust injury occurred. Accordingly, the district court correctly concluded that summary judgment was appropriate.

B.

The Imaging Center next alleges exclusive dealing as a result of WMHS's exclusive radiology contracts with Tri-State for inpatient radiology services at WMHS. The inquiry into exclusive dealing arrangements focuses on whether the arrangement forecloses competition among producers or suppliers in a substantial share of the affected market. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961). That is, "the plaintiff must show that 'the opportunities for other traders to enter into or remain in that market [are] significantly limited' by the exclusive-dealing arrangement." Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1987) (quoting Tampa Elec., 365 U.S. at 328). Courts then evaluate exclusive contracts under the rule of reason. Id. at 1294 ("[A]fter determining that market foreclosure is substantial, the court should consider whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies.").

14

The exclusive contracts for inpatient radiology services at WMHS account for 80% of all radiology services performed in the greater Cumberland area. J.A. 356, 316. However, even assuming, _arguendo_, that this represents a substantial foreclosure of the relevant market, Defendants have offered evidence of the procompetitive benefits justifying these contracts. They produced testimony that exclusive contracts for inpatient radiology services are the norm in the industry[5] and that exclusive arrangements are needed for "control of quality, control of cost, provision of services, ensuring the availability of services 24/7, 365 days a year, to ensure that the practitioners are highly qualified, and to minimize the disruption of services that can exist when a number of different providers are involved in that service." J.A. 982-83. The exclusive contract itself listed these and other benefits as the reasons for entering the agreement. J.A. 1304-05.

The district court found that The Imaging Center had offered no effective rebuttal to these procompetitive justifications. We agree. As discussed above, The Imaging Center's contentions of reduced output and quality of radiology services are unsupported. Also, prices did not increase during the relevant period and the concern that new competitors would not be able to enter the market

---

[5]Indeed, for years before Memorial and Sacred Heart affiliated into WMHS, both hospitals employed exclusive contracts for the supply of radiology services, including the one under which Dr. Jackson had practiced at Memorial.

went unrealized. That some WMHS officials indicated a desire to ensure that outsiders, particularly Dr. Jackson, remain excluded, does not show an unreasonable harm to competition. The purpose of such contracts is to exclude outside providers, and yet such exclusion does not automatically violate the antitrust laws. Nor does the existence of internal strife at Tri-State as a result of the radiology firms' merger contradict the legitimate justifications offered.

Therefore, The Imaging Center has failed to raise a genuine issue of material fact to counter Defendants' legitimate business justifications. Accordingly, we agree with the district court that summary judgment was appropriate on The Imaging Center's exclusive dealing claim.


IV.

Under § 2 of the Sherman Act, The Imaging Center alleges both monopolization and attempted monopolization. Monopolization requires, "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." Oksanen, 945 F.2d at 710 (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n.19 (1985). Attempted monopolization requires "(1) a specific intent to monopolize the relevant market;

16

(2) predatory or anticompetitive acts in furtherance of the intent; and (3) a dangerous probability of success." M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 166 (4th Cir. 1992).

The Imaging Center contends that the district court improperly refused to consider whether the conduct that the court found did not violate § 1 of the Sherman Act nevertheless violated § 2. We disagree. Attempted monopolization explicitly requires predatory or anticompetitive conduct, and monopolization has been interpreted to require the same. White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 105 (4th Cir. 1987) (for monopolization, a plaintiff "must show that a jury could find no valid business reason or concern for efficiency" in the conduct); accord Oksanen, 945 F.2d at 710. In addressing The Imaging Center's § 1 claims, the district court had already determined that the conduct alleged to violate § 2 was not anticompetitive and had "valid business and patient care reasons." See Oksanen, 945 F.2d at 710. The district court, therefore, appropriately declined to re-engage in this inquiry under § 2.[6]

---

[6]Courts generally consider conduct not deemed anticompetitive under § 1 similarly unactionable under § 2. See R.J. Reynolds Tobacco v. Philip Morris, Inc., 199 F. Supp. 2d 362, 395 n.24, aff'd without published op., 67 Fed. Appx. 810 (4th Cir. 2003); Retina Assocs., P.A. v. S. Baptist Hosp., 105 F.3d 1376, 1384 (11th Cir. 1997) (per curium) ("While participating in an unlawful horizontal group boycott may be sufficient to establish a Section 2 claim, here such a finding is precluded by the Court's grant of summary judgment against Plaintiff on Count I. As such, there is no genuine issue of material fact as to the existence of predatory conduct."); Williams v. I.B. Fischer Nevada, 999 F.2d 445, 448 (9th

17

To the extent that the circumstances surrounding the Allegany land sale were not considered with regard to allegations of a group boycott or exclusive dealing, these actions, too, do not support § 2 liability. The Imaging Center contends that WMHS deliberately interfered with its proposed expansion by influencing the trustees' vote. Instead, the record shows that the trustees, when presented with the difficult situation in which a majority had a conflict of interest, sought and followed outside advice on how to act ethically and within their powers as trustees. Other than alerting Trustee Leonard to the conflict of interest, The Imaging Center has failed to show that WMHS had anything to do with the vote or that the voting conflicted trustees violated their fiduciary duties to Allegany College.

Accordingly, we find that the district court correctly granted summary judgment on The Imaging Center's monopolization and attempted monopolization claims.

---

Cir. 1993) ("[A] § 1 claim insufficient to withstand summary judgment cannot be used as the sole basis for a § 2 claim.") (internal quotation omitted).

The Imaging Center argues that a recent D.C. Circuit decision supports its claim that conduct deemed legitimate under § 1 can still support liability under § 2. See United States v. Microsoft Corp., 253 F.3d 34, 70 (D.C. Cir. 2001)). The Microsoft court, however, dealt with a scenario where the exclusive contracts did not foreclose a sufficient portion of the market to violate § 1, but had no procompetitive justification, making them actionable under § 2. Id. at 71. Although exclusive dealing is alleged here, a procompetitive justification has also been shown, as discussed above. The conduct alleged for the § 1 claims, therefore, is of no avail to The Imaging Center's monopolization and attempted monopolization claims.

V.

The Imaging Center also alleges various Maryland state law causes of action. To the extent that The Imaging Center appeals summary judgment under the Maryland antitrust statutes, we agree with the district court that these claims fail for the same reasons that the analogous federal claims fail. See Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp., 878 F. Supp. 804, 818 (D. Md. 1995), aff'd without published op., No. 95-2488, 1996 WL 412584 (4th Cir. July, 24, 1996). Likewise, by The Imaging Center's failure to argue its misappropriation of trade secrets claim before this Court or the district court, we agree that summary judgment was appropriate. The Imaging Center's remaining claims are for malicious interference with business relations and unfair competition.

A.

Malicious interference with business relations requires, "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." Natural Design, Inc. v. Rouse Co., 485 A.2d 663, 675 (Md. 1984) (internal quotation omitted).

19

The Imaging Center argues that Defendants achieved their desire to "[p]re-empt" The Imaging Center's "major competitive initiative" by interfering with the Allegany College land sale. See J.A. 1370-71. As the district court noted and as discussed above, The Imaging Center has failed to present evidence that WMHS used improper means to interfere with the trustees' decision. Nor does Zachair, Ltd. v. Driggs, 762 A.2d 991 (Md. Ct. Spec. App. 2000), support The Imaging Center's claim. In Zachair, a company that had nothing to gain by interfering with the plaintiff's permitting process did so while under the defendant's control. 762 A.2d at 1010-11. Here, however, the trustees articulated two legitimate motives for opposing the sale and followed independent advice about how to proceed. Defendants are therefore entitled to summary judgment.

## B.

The Imaging Center last alleged that Defendants' actions violated Maryland's unfair competition law. Maryland defines unfair competition as "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods." Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc., 454 A.2d 367, 374 (Md. Ct. Spec. App. 1983) (internal quotation omitted). The Imaging Center argues that conduct need not be unlawful to be unfair. See Trimed, Inc. v. Sherwood Med. Co., 977 F.2d 885, 891 (4th Cir. 1992).

20

However, it has failed to show how the conduct discussed above was unfair, even if it was not unlawful. We agree with the district court that there is no support in the record for "fraud, deceit, trickery or unfair methods," and grant summary judgment on this claim as well.

## VI.

Because we find, for the foregoing reasons, that the district court correctly determined that The Imaging Center failed to raise a genuine issue of material fact with regard to its claims, the district court's grant of summary judgment to Defendants on all counts is hereby affirmed.

AFFIRMED